# EXHIBIT 1

**SUM-100**

# SUMMONS
## *(CITACIÓN JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

SONY MUSIC ENTERTAINMENT, a Delaware corporation d/b/a Sony Masterworks and Milan Entertainment; and DOE 1 through DOE 20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

LOS LOBOS, a California partnership

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/08/2025 1:44 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Galicia, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Los Angeles Superior Court<br><br>Stanley Mosk Courthouse, 111 N Hill Street, Los Angeles, CA 90012 | CASE NUMBER:<br>*(Número del Caso):*<br>**25STCV35739** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Evan S. Cohen, COHEN MUSIC LAW, 1482 E. Valley Rd. #622, Santa Barbara, CA 93108, (805) 837-0100

| DATE:<br>*(Fecha)*  12/08/2025 | David W. Slayton, Executive Officer/Clerk of Court<br>Clerk, by<br>*(Secretario)*  E. Galicia | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.

2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* **SONY MUSIC ENTERTAINMENT, a Delaware corporation d/b/a Sony Masterworks and Milan Entertainment**

under: ☒ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

For your protection and privacy, please press the Clear This Form button after you have printed the form.

**EXHIBIT 1**



**5**

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/08/2025 1:44 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Galicia, Deputy Clerk

1
Evan S. Cohen, SBN 119601
esc@manifesto.com

2
COHEN MUSIC LAW
1482 E. Valley Rd. #622

3
Santa Barbara, CA 93108
(805) 837-0100

4

5
Bridget B. Hirsch, SBN 257015
bridget@byrneshirsch.com

6
BYRNES HIRSCH P.C.
2272 Colorado Blvd. #1152

7
Los Angeles, CA 90041
(323) 387-3413

8

9
Attorneys for Plaintiff Los Lobos

10

11
### SUPERIOR COURT OF THE STATE OF CALIFORNIA

12
### COUNTY OF LOS ANGELES

13
### CENTRAL DISTRICT – STANLEY MOSK COURTHOUSE

14

15
LOS LOBOS, a California partnership,

Case No.: 25STCV35739

16
            Plaintiff,

COMPLAINT FOR:

17
v.

(a)   BREACH OF CONTRACT; AND

18
SONY MUSIC ENTERTAINMENT, a
Delaware corporation d/b/a Sony Masterworks

(b)   AN ACCOUNTING

19
and Milan Entertainment; and DOE 1 through
DOE 20, inclusive,

20

21
            Defendants.

22

23

24

25

26

27

28

**EXHIBIT 1**
**6**

Plaintiff LOS LOBOS alleges:

# I

## GENERAL ALLEGATIONS

1.     Plaintiff Los Lobos is a musical group and partnership, existing under the laws of the State of California, and has its principal place of business in Los Angeles County, California. The partnership is comprised of David Hidalgo, Louie Pérez, Cesar Rosas, Conrad Lozano, and Steve Berlin.

2.     Defendant Sony Music Entertainment ("Sony") is a corporation organized under the laws of the State of Delaware and has its principal place of business in New York, New York. Sony does business under the tradenames Sony Music Masterworks, as well as Milan Entertainment and/or Milan Records.

3.     The true names or capacities, whether individual, corporate, or otherwise, of defendants DOE 1 through DOE 20, inclusive, are unknown to plaintiff, which therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants designated herein as a DOE is legally responsible in some manner for the events and happenings referred to below and legally caused injury and damages proximately to plaintiff as alleged below.

4.     Venue is proper in this district because the contract at issue was entered into within the City of Los Angeles, in Los Angeles County.

## II

### FIRST CAUSE OF ACTION

### FOR BREACH OF CONTRACT

#### (Against Defendant and DOE 1 through DOE 10)

5.     Plaintiff re-alleges paragraphs 1 through 4, inclusive, as if fully set forth.

6.     Los Lobos is a musical group from East Los Angeles. After forming in 1973, the band rose to international stardom in 1987, when its version of "La Bamba" peaked at the top of the Billboard *Hot 100,* and also topped the charts in the United Kingdom, and at least thirteen other countries. In 2015, Los Lobos was nominated for induction into the Rock and Roll Hall of Fame,

**EXHIBIT 1**

**7**

1  and in 2018, the group was inducted into the Austin City Limits Hall of Fame and the California

2  Hall of Fame. As of 2024, Los Lobos has been nominated for twelve Grammy Awards and has

3  won four.

4        7.      In or about late 1993, the five individual members of Los Lobos agreed to provide

5  several of the soundtrack recordings for the motion picture entitled *Desperado* (the "Picture")

6  directed by Richard Rodriquez. Eventually, the members of Los Lobos entered into a written

7  "Artist/Composer Deal Memorandum" with a production company called El Mariachi

8  Productions, Inc. ("EMP"), dated "as of October 15, 1993" (the "Agreement"). A true and correct

9  copy of the Agreement is attached hereto as "Exhibit A." The rights of the individuals who are

10  named in the Agreement are owned and controlled by the plaintiff partnership.

11        8.      Pursuant to that Agreement, Los Lobos recorded, with actor Antonio Banderas

12  ("Banderas"), a composition entitled "Canción del Mariachi" (the "Composition") for prominent

13  placement in the Picture (the "Recording"). One of the members of Los Lobos, Cesar Rosas, wrote

14  the Composition in its entirety. The Agreement was with Los Lobos only; Banderas was not a

15  party to it.

16        9.      The Agreement provided, in pertinent part, that: (1) Los Lobos would compose one

17  composition to be recorded with Banderas, and, at EMP's request, record and compose several

18  other pieces of music called "Guitar Pieces;" (2) EMP would pay Los Lobos a recording "Fund"

19  to be used for the "creation of the Work," and the Fund was to be 50% recoupable against royalties;

20  (3) Los Lobos would receive "Record Royalties," which were specified to be "…with respect to

21  the Master equal to twenty-four percent (24%) of the wholesale price (or its retail equivalent) from

22  time to time for the net sales of the soundtrack album derived from the Picture." The royalty was

23  to be pro-rated by the number of selections on the soundtrack album to be derived from the Picture

24  (the "Soundtrack Album"), and in the case of "singles," the royalty was to be pro-rated by the

25  number selections on the single; and (4) "Company agrees to use its reasonable efforts to cause

26  the Distributor [of the Soundtrack Album or its recordings] to account for and pay Artist's royalties

27  directly to Artist."

28

**EXHIBIT 1**
**8**

10.    Columbia Pictures Industries, Inc., a company related to Sony, released the Picture on August 25, 1995, and Epic Soundtrax (an imprint of Sony) released the Soundtrack Album on August 9, 1995, worldwide. The Recording was the opening track on that album, reflecting its prominence in the Picture (in which it was played over the opening credits, with Banderas providing a visual vocal performance). At or about that time, Epic Soundtrax also released the Recording as a single, in Europe.

11.    At some point, Sony subsumed the rights of EMP in and to the Recording and registered it in the Copyright Office as No. SR0000251474 in 1997. A true and correct copy of the abstract of that registration, from the website of the Copyright Office, is attached hereto as "Exhibit B."

12.    Plaintiff does not have information as to how long the Soundtrack Album remained "in print" (on a Sony-affiliated label) after 1995, but in 2004, Milan Entertainment, Inc. d/b/a Milan Records ("Milan"), at that time an independent record company focused on releasing soundtrack albums, released a compilation album entitled *Robert Rodriguez's Mexico and Mariachis* (the "Compilation Album"), which Milan described (in a sticker affixed to the cover of the Compilation Album) as a "The Best of the Mariachi Trilogy." The liner notes to that release stated that the Recording was included "Courtesy of Columbia Pictures."

13.    Plaintiff does not have information as to whether Milan ever exploited the Compilation Album digitally, in its entirety (that is, as Sony released it in 1995). However, on February 23, 2018, Milan did release the Recording, worldwide, in a two-track streaming release, with the shortened title *Mexico and Mariachis* (the "2018 Milan Streaming Release"). That 2018 date is the release date listed on both Spotify and Milan's own audio-only release of the Recording posted on YouTube. As of the present date, the Recording has approximately 150 million reported streams on Spotify, and approximately 150 million streams on YouTube (that is, including both YouTube for audio-visual works, and YouTube Music, which is audio-only streaming).

14.    In July 2019, Sony Music Masterworks, a wholly owned subsidiary of Sony, purchased Milan, according to a press release from Milan issued at that time. As of the present time, the Milan web site acknowledges that "Milan Records is an imprint of Sony Music Masterworks, a label of Sony Music Entertainment." Milan is, therefore, fully and completely owned by Sony. Sony also owns the Recording, since at least 1997, and the royalty obligations to

4
Complaint

**EXHIBIT 1**
**9**

Los Lobos for worldwide streaming of the Recording are, and have been at all relevant times herein, fully Sony's obligation.

15.     However, despite those obligations, plaintiff's representatives have recently discovered that neither Sony, nor Milan, or any other Sony-related entity has *ever* accounted to Los Lobos for any digital streaming of the Recording in any country, territory, or place, for any streaming, at any time, for any royalty period.

16.     And, in the past two years specifically, Sony's failure to account has become even more egregious. To add to the wide popularity that the Recording has already enjoyed, substantially increased streaming activity recently occurred because of the use of the Recording by a famous "mixed martial arts" fighter of Spanish/Georgian nationality named Ilia "El Matador" Topuria ("Topuria"), as his "walkout" song or "Anthem." On account of Topuria's popularity, the Recording has been utilized in various media and television programming in many countries. Plaintiff is informed and believes, and thereon alleges, that the use of the Recording by Topuria began in or about February 2024 at major "UFC" ("Ultimate Fighting Championship") events and related YouTube videos, and continues at this time. However, despite all of these millions of streams of the Recording worldwide, the various uses by Topuria, and his endorsement and involvement, there has never been a single royalty statement rendered by Sony to Los Lobos that reports *any* streaming of the Recording, as used in the 2018 Milan Streaming Release, or *any* licensing activity.

17.     Milan and, therefore, Sony, is apparently well aware of the value of Topuria's endorsement and use of the Recording; Milan has changed the title of the Recording on Spotify to "Canción del Mariachi (Ilia Topuria 'El Matador' Anthem)." Milan has also utilized that new title for the video it originally posted (on February 23, 2018) on YouTube, that currently has 36 million streams. Plaintiff does not know the date that Sony changed the title of the Recording (on Spotify and elsewhere, and on YouTube, for the audio-only video of the Recording) to capitalize on the popularity of Topuria, but plaintiffs will propound discovery as to those particular facts. And yet, despite the specific knowledge that the popularity of the Recording was spiking and reaching new audiences, Sony and Milan still paid *nothing* to Los Lobos for streaming, and continues to pay *nothing*, for streaming anywhere in the world or for any time period.

18.     Based upon the foregoing facts, within the past four years, Sony has materially breached the Agreement by: (1) failing to pay royalties to Los Lobos that are, and have been, due

**EXHIBIT 1**
**10**

and owing to Los Lobos, on account of the revenues received by Sony from the exploitation of the Recording by means of streaming, in any country, region, territory, or place in the entire world, in any time period; (2) to the extent that the facts of the relationship between Milan and Sony would warrant accountings from Milan to Los Lobos, by failing to instruct Milan to account directly to Los Lobos for royalties due from the exploitation of the Recording, in violation of ¶ 3.C. (iii) of the Agreement.

19.    Plaintiff Los Lobos has performed all of the obligations that it had under the Agreement.

20.    The royalties owed to Los Lobos for the 2018 Milan Streaming Release, and the damages that Los Lobos has suffered on account of Sony's complete failure to pay streaming royalties *at all*, are very substantial. By utilizing language in ¶ 3.C. (i) of the Agreement that the royalty for the Recording would be based upon the "wholesale price," the parties intended that Los Lobos would receive a percentage of the net revenue that the label received "through the door," in common parlance. Los Lobos is, then, according to that royalty computation, entitled to receive 24% of the net revenue that Sony receives from digital streaming of the Recording. According to generally accepted music industry data, record labels receive an average of about $0.004 per stream. Plaintiff is informed and believes and thereon alleges that the worldwide total streams that have been generated by the Recording, in the past several years, exceed **600 million**. The revenue from 600 million streams, according to generally accepted recording industry per-stream average revenues, is approximately $2,400,000 to $3,000,000, and 24% of that revenue is approximately $500,000 to $750,000, in an amount to be determined by documents and electronic data (relating to worldwide exploitation of the Recording via streaming) to be obtained through discovery upon each of the defendants, and through discovery to be served on other companies that have or may have pertinent documents and information, and at trial.

21.    In addition, the royalties owed to Los Lobos from the 2018 Milan Streaming Release are not to be pro-rated (as per ¶ 3.C. (i) of the Agreement) between the two recordings thereof, because the pro-ration set forth in that subparagraph pertains *only* to physical product (in which a consumer is purchasing a whole album or multi-track single and has necessarily purchased all of the recordings on a particular phonorecord release and not just one recording) or a so-called "album download" of an entire album or an entire multi-track single. The very concept of pro-rating royalties, based upon "the number of tracks on an album," is, in the world of streaming,

6
Complaint

**EXHIBIT 1**

**11**

wholly inapplicable and obsolete. Thanks to streaming, a consumer can choose the recording to which he or she would like to listen, and Sony has received completely separate revenue from the streaming of that Recording *only*. The other recording on the 2018 Milan Streaming Release was not recorded by Los Lobos, did not involve the Agreement, and was from another film (*Once Upon a Time in Mexico*), and, in any event, amounted to barely one percent of the streaming that has occurred with regard to the 2018 Milan Streaming Release, according to current Spotify streaming data.

22.    Nor is the 24% royalty to be "split" or "divided" between Los Lobos and Banderas. The royalty set forth in the Agreement belongs entirely to Los Lobos, and Banderas is not a party to the Agreement. Plaintiff is informed and believes and thereon alleges that Banderas had his own agreement with EMP and, therefore, with Sony presently, and that Sony has the obligation to account to Banderas separately for whatever royalty that EMP agreed to pay to him.

23.    Plaintiff is informed and believes and thereon alleges that there has been exploitation of the Recording by defendants, other than streaming, for which defendants have issued licenses and collected revenue, and for which defendants owe Los Lobos a royalty, namely, 24% of net revenues. For instance, plaintiff has knowledge (because Los Lobos member Cesar Rosas wrote, composed, and publishes the Composition) that it is likely that Sony has issued so-called "master use licenses" for the use of the Recording in television programming, in connection with Topuria-related events. Sony has failed to account to Los Lobos, or to pay Los Lobos, for any such licensing activity, at any time.

24.    Based upon the foregoing, as a result of the breach of the Agreement by Sony, Los Lobos has been damaged in an amount to be proven at trial, but no less than $500,000.

## III

## SECOND CAUSE OF ACTION

## FOR AN ACCOUNTING

### (Against Defendant Sony and DOE 1 through 15)

25.    Plaintiff re-alleges paragraphs 1 through 4, and 6 through 24, inclusive, as if fully set forth.

26.    In the past four years, Sony has breached the Agreement by failing to account to Los Lobos for royalties generated in any country, territory, region, or place, at any time, from (1)

**EXHIBIT 1**

**12**

1    the streaming of the Recording by any and all Digital Service Providers, and (2) the licensing of

2    the Recording for use in television productions, or any other audio-visual uses.

3         27.     There is no adequate remedy at law, and the equitable remedy of an accounting is

4    just, because the multiplicity of transactions, and the length of time during which these transactions

5    occurred, make the accounts too complicated to be dealt with in a court of law.

6         28.     In addition, because of the large amount of data that plaintiff requires to determine

7    the correct and complete amounts that are due and payable, the equitable power of this court is

8    necessary to obtain a true and complete record of the exploitation of the Recording.

9 IV

10 PRAYER FOR RELIEF

11       WHEREFORE, plaintiff prays for judgment as follows:

12         1.      On the First Cause of Action, for damages for breach of the Agreement in an

13    amount to be proven at trial, but in no event less than $500,000;

14         2.      On the Second Cause of Action, for an accounting from defendants, for all of the

15    past streaming exploitation (and licensing) of the Recording, throughout the world, in an amount

16    to be proven at trial;

17         3.      For interest on the unpaid amount at the legal rate, from the dates that payments

18    should have been made to Los Lobos by defendants;

19         4.      For costs of suit incurred; and

20         5.      For such other and further relief as the court should deem just and proper.

21

22    Dated: December 8, 2025              COHEN MUSIC LAW

23

24                            By: _____

25                                EVAN S. COHEN

26                 Attorneys for Plaintiff Los Lobos

27

28

8
Complaint

**EXHIBIT 1**

**13**

**EXHIBIT A**

**EXHIBIT 1**
**14**

ARTIST/COMPOSER DEAL MEMORANDUM

Dated:  As of October 15, 1993
Revised October 28, 1994
Revised February 7, 1995
Revised April 6, 1995
Revised July 31, 1995
Revised August 29, 1995

Mr. Steve Berlin
Mr. Conrad Lozano
Mr. Cesar Rosas
Mr. Louis Perez
Mr. David Hidalgo
a/k/a Los Lobos
c/o Ziffren, Brittenham & Branca
2121 Avenue of the Stars
Suite 3200
Los Angeles, CA   90067

Re:  "Desperado" fka "Return of the Mariachi"
      fka "El Mariachi II"/Los Lobos

Gentlemen:

    This will confirm the terms of the agreement between El
Mariachi Productions, Inc. ("Company"), on the one hand, and Mr.
Steve Berlin, Conrad Lozano, Cesar Rosas, Louis Perez and David
Hidalgo, collectively known as "Los Lobos" (individually and
collectively, "Artist"), on the other hand, with respect to the
theatrical motion picture currently entitled "Desperado" fka
"Return of the Mariachi" fka "El Mariachi II" (the "Picture").

1.   Deleted.

2.   ARTIST'S SERVICES:

    A.  Artist will render the following services as the composer
of the original musical score (the "Score") for the Picture:  (i)
arrange, compose and orchestrate the Score; (ii) record, conduct,
produce and deliver "film mixes," and, at the election of Company,
"record mixes" of the Score ("Score Masters") acceptable to
Company; (iii) compose one (1) original musical composition
intended to be sung by Antonio Banderas in character on screen in
the Picture and an original musical composition intended for the
end titles of the Picture, each composition intended to consist of
both music and lyrics (individually, a "Composition";
collectively, "Compositions"); (iv) at Company's request therefor,
compose three (3) guitar pieces intended primarily as "bridge"
music for the film ("Guitar Pieces"); and (v) record, produce and
deliver "film mixes" and, at Company's election, "record mixes" of
the Compositions ("Song Masters") technically satisfactory to

**EXHIBIT 1**

**15**

Company. (The Score; the Score Masters; the Song Masters; the Guitar Pieces; and all other results and proceeds of Artist's services pursuant to this Paragraph 2, excluding the Compositions themselves, are collectively referred to as the "Work." The Score Masters and the Song Masters, if any, are collectively referred to as the "Master.") Company acknowledges that Artist has completed the forgoing services to Company's satisfaction.

B. Artist will render the following services as musicians and singers of the Score: (i) perform, record and produce the Score Masters and the Song Masters in recording studios and with a producer ("Producer") and any supplemental musicians designated by Artist and approved by Company; (ii) if a Song Master is utilized in the Picture, Artist also agrees to perform the Song Masters on-camera in promotional music video clips embodying film footage from the Picture (individually and collectively, "Video") at times and in places mutually agreed between the parties, provided that such agreement is subject to Artist's prior contractual commitments and the approval of Slash Records ("Slash"), not to be unreasonably withheld, and provided further that the cost of producing such promotional music video clips shall be borne by Company and shall not be recoupable against Artist's royalties.

C. Artist hereby represents and warrants that Artist is currently signed to an exclusive recording agreement with Slash and that Artist has obtained a Waiver of Exclusivity ("Waiver") from Slash regarding Company's use of the Master as provided herein; such Waiver is attached hereto as Exhibit "A-1." Artist further represents and warrants that Artist shall obtain a similar Waiver from London Records in the form of the attached Exhibit "A-2" with respect to the territories for which London Records controls distribution of Artist's recordings.

D. The term of this agreement will begin upon the commencement of services hereunder and will continue until Artist completes all services required hereunder. Time is of the essence of this agreement.

E. Artist will comply with Company's reasonable requests and instructions concerning the services required hereunder. Artist will not incur any expenditures or liabilities in excess of the Fund (as defined below) without first obtaining Company's express approval.

3. COMPENSATION. In consideration for Artist's services performed hereunder and the grant of rights being made to Company by Artist, Company hereby agrees to pay Artist the following:

A. Fund for the Work: Artist will receive an "all-in" fund ("Fund") for creation of the Work of One Hundred Forty-seven Thousand Five Hundred Dollars ($147,500), payable as follows:

**EXHIBIT 1**

**16**

(i)    Sixty-Two Thousand Five Hundred Dollars ($62,500) thereof promptly following the last to occur of (a) Company's receipt of written confirmation of the terms of this deal memorandum and the Form I-9 previously supplied to Artist by Company; (b) execution by Artist of the Certificate of Recording previously supplied to Artist by Company; and (c) commencement of Artist's services hereunder; Artist acknowledges receipt of this payment; and

(ii)    In the event Company elects to cause Artist to write and record a second musical composition, Company will pay Artist an additional $22,500 as follows: (a) $16,875 to Artist, receipt of which is hereby acknowledged; and (b) $6,225 payable to Bug Music as Artist's exclusive music publishing administrator as an irrevocable assignment by Artist; Artist acknowledges that this payment has been made to Bug Music; and

(iii)    The balance thereof promptly following the delivery to Company of the Work or execution of a long-form agreement, whichever is later.

The Fund will be inclusive of any and all recording costs for the Work and the Compositions, including, without limitation, the Producer fee, all usual recording costs and mixing costs (excluding any costs of remixing after delivery to Company of the Work), the costs of acquiring any samples, all travel and related expenses of Artist and others engaged by Artist in the recording and production of the Master but not including such expenses of employees of Company, all fees to Artist (including composing fees, producing fees, master fees, fees to any orchestrator(s) or any monies due to any third parties engaged by Artist and all required applicable minimum union scale, whether as an arranger, conductor and/or musician, whether as a leader or otherwise). All fees referred to above in excess of the Fund will be paid for by Artist. If Company pays any of the above costs in connection with the Work or the Compositions, then Company will have the right to deduct same from any and all monies payable to Artist hereunder. The Fund will not include reuse fees or conversion costs, if any, or costs of mastering and re-mixing for singles, if any, which costs are incurred after delivery. Artist will be deemed to be an independent contractor for all purposes with respect to this agreement, and Artist hereby agrees to make any and all deductions and/or withholdings required under local, state or federal law with respect to the monies payable hereunder. Artist will indemnify and hold Company and it's licensees, officers, agents and employees harmless from and against any claims, charges, damages, costs, expenses (including reasonable outside attorneys' fees), judgments, settlements, penalties, liabilities or losses of any kind or nature whatsoever, which may be made, asserted, maintained, sustained or suffered by or secured against or imposed upon Company, or any of its licensees, officers, agents or employees, by reason of Artist's failure to make any required

**EXHIBIT 1**

**17**

deductions and/or withholdings or any payments or to meet any
other contractual or financial obligation required pursuant to the
rules and regulations of the American Federation of Musicians or
of any applicable collective bargaining agreement which may have
jurisdiction over the services for which Artist may contract.

B.  Songwriter Royalties.  Artist will receive customary
songwriter royalties with respect to the Score (i.e., ten cents
(10¢) per copy of sheet music sold in the U.S. and Canada; twelve
and one-half percent (12.5%) of the wholesale price for songbooks,
prorated by the number of selections; fifty percent (50%) of net
sums for other publishing revenues earned in the U.S. and Canada;
and fifty percent (50%) of net sums for publishing revenues earned
outside of the U.S. and Canada), provided Company's (or Company's
music publishing designee's) agreements with its affiliated
subpublishers shall provide that such subpublishers pay to Company
(or its publishing designee) at least seventy-five percent (75%)
of the publisher's share of mechanical royalties generated in the
applicable territory from uses of the Work and fifty percent (50%)
of such mechanical royalties attributable to local cover
recordings of the Work.  Said royalties with respect to the Score
will be reduced proportionately to take into account any co-
writing (including lyricist) services, provided that Company will
not add English lyrics or otherwise alter Artist's lyrics or
engage a co-writer without Artist's approval.  The term "net sums"
as used hereinabove shall mean all monies actually received by
Company (or Company's publishing designee) in the United States or
credited to Company's (or Company's publishing designee's) account
in United States currency which are directly attributable to the
uses enumerated above (except public performance payments), after
deduction of all costs of collection and foreign taxes.

C.  Record Royalties.

(i)  Rate.  Artist will receive an "all-in" royalty,
inclusive of the Producer's royalty and any royalty payable for
any "sampled" material, with respect to the Master equal to
twenty-four percent (24%) of the wholesale price (or its retail
equivalent) from time to time for net sales of the soundtrack
album derived from the Picture ("Album"), if any, sold through
normal retail channels in the United States ("USNRC Sales"),
prorated by the number of selections on the Album (i.e., twenty-
four percent (24%) multiplied by a fraction, the numerator of
which is the number of selections on the Album which comprise the
Work and/or the Composition and the denominator of which is the
total number of royalty-bearing selections on the Album).  The
royalty payable by Company to Artist on any USNRC Sales of single
records derived from the Album embodying the Master ("Single")
shall be computed by multiplying twenty-four percent (24%) (or its
retail equivalent) by a fraction, the numerator of which will be
Company's aggregate U.S. royalty for any such single and the
denominator of which will be Company's aggregate unescalated U.S.

EXHIBIT 1
18

royalty for the Album, prorated by the number of selections embodied thereon. Said royalties will otherwise be computed and paid in the same manner as Company's royalty is computed by the record distributor of the Album ("Distributor") and be subject to the same reductions, deductions and category variations as is Company's royalty (including, without limitation, tape, foreign, compact discs, record clubs, mid-priced, budget, coupling, flat fee licensing, free goods, discounts, packaging deductions, royalty base, reserve policy, etc.). Promptly following execution of an agreement with Distributor for the Album, Company will furnish Artist with a royalty abstract of the relevant provisions of such agreement. Company will use reasonable efforts to cause Distributor to account directly to Artist. Notwithstanding the foregoing, Company shall not couple Masters hereunder on non-Soundtrack phonorecords without Artist's prior written consent and the consent of Artist's record labels each in its applicable territory, not to be unreasonably withheld, provided that so-called "sampler" records shall not require such consent.

(ii)  Payment & Recoupment.  No record royalties will be payable to Artist until one-half (1/2) of the Fund has been recouped by the Distributor of the Album, or Company, as the case may be, along with all conversion costs (including, without limitation, "sweetening," editing costs solely in connection with the Picture and Soundtrack, transfer costs and union reuse fees) relating to the inclusion of the Master in the Picture and on the Album and single, if any, from the aggregate record royalties payable to Artist hereunder. After recoupment, said royalties will be paid prospectively (i.e., on all records sold after such recoupment).

(iii)  Company agrees to use its reasonable efforts to cause the Distributor to account for and pay Artist's royalties directly to Artist. Should said Distributor refuse to directly pay and account to Artist, Company shall render accountings and royalty payments to Artist within forty-five (45) days after Company's receipt of such accountings and royalty payments from said Distributor. Artist shall be deemed to have consented to all royalty statements and all other accounts rendered by Company to Artist, and said statements and other accounts shall be binding upon Artist and not subject to any objection by Artist for any reason, unless specific objection in writing, stating the basis thereof, is given by Artist to Company within three (3) years from the date rendered. Artist will have the right once annually at Artist's expense to audit Company's books and records relating to disputed royalty statements at Company's offices during ordinary business hours subject to advance notice, provided that such audit is conducted by a public accountant and is not disruptive of Company's business.

**EXHIBIT 1**
**19**

4.   <u>RIGHTS OF ARTIST</u>:

A.  <u>Master</u>.  The Master will be deemed a "work made for hire" for Company and Company will retain ownership of the Master, provided, however, that Artist will have the right, without charge from Company therefor, to include the Master on one (1) Artist studio album and on one (1) Artist greatest hits type album so long as (1) any such album is not released anywhere in the world within one (1) year following the later of the release of the Album or the Picture in the United States; (2) any such album and all paid ads one-half (1/2) page or larger therefor contain a credit for the Picture as follows: "As featured in the Columbia motion picture "Desperado," provided that inadvertent failure to accord such credit shall not be deemed a breach of this agreement; and (3) Artist, or Slash Records or any other applicable record company, agrees to pay all fees and/or royalties due to Artist, and/or Producer, all required mechanical royalties, all required "per record" payments due pursuant to any union or guild agreements and any and all marketing, manufacturing or distribution costs with respect to any such album containing the Master.

B.  <u>Credit as Composer</u>.

(i)  Provided that more than fifty percent (50%) of the total background musical score embodied in the Picture is Score, then Company agrees to accord Artist a credit in the main titles of the Picture on a separate card (or the end titles thereof if the producer, director and writer credits are only in the end titles thereof) substantially as follows:

"MUSIC BY LOS LOBOS"

(ii)  Provided the Composition is embodied in the Picture as released, then Company will accord Artist a "Written by" credit on a crawl in the end titles of the Picture in accordance with Paragraph 4.C(i) below.

(iii)  Provided that more than fifty percent (50%) of the total background musical score embodied in the Picture is Score, then Company agrees to accord Artist credit substantially in the form of "Music By Los Lobos" in all paid advertisements placed by or under the control of Company in respect to the Picture, subject to Company's customary exclusions attached hereto as Exhibit "B."  Notwithstanding the foregoing, Artist will receive credit whenever the complete billing block for the Picture appears.

(iv)  Company will use its reasonable efforts to cause Artist to receive credit on the front cover of the Album to be worded in the same manner as in Paragraph 4.B(i) above if more than fifty percent (50%) of the total music (as determined by

**EXHIBIT 1**
**20**

total running time) included on the Album is Score and Song Master combined.  In the event Company is unable to secure such credit on the front cover of the Album, then Company will cause such credit on the back cover thereof.  In the event fifty percent (50%) or less of the total music (as determined by total running time) included on the Album is Score, then Company will accord Artist a credit in the form "Original score written, produced and performed by Los Lobos" on the back cover and/or in the liner notes of the Album with respect to each recording written by Artist and embodied thereon, subject to Distributor's label and packaging policies.

    (v)  All other characteristics of the aforementioned credits will be at Company's sole discretion, and no casual or inadvertent failure to comply with said provisions will be deemed a breach hereof.

    C.   Credit as Performer.

    (i)  Provided that the Song Masters are embodied in the Picture as released, Company agrees to accord Artist credit in the end titles of the Picture on a crawl substantially as follows:

                    "[ title of composition ]"
              Produced by _____
              Written by _____
                   Performed by Los Lobos
                   Courtesy of Slash Records

    (ii)  Subject to the Waiver and provided that the Song Masters are included on the Album, Company agrees to accord Artist substantially the credit set forth in Paragraph 4.C(i) above on the back cover, liner notes and/or label of the Album, subject to the Distributor's label policies.

    (iii)  All other characteristics of the aforementioned credits will be at Company's sole discretion, reasonably exercised.  No casual or inadvertent failure by Company or a third party to comply with the provisions of the Paragraph 4.C.(i) will constitute a breach of this agreement, provided such failure, if curable, is cured promptly following receipt of notice thereof.

5.   RIGHTS OF COMPANY.

    A.   Work.  Company will engage Artist on an "employee-for-hire" basis and the Work will be a "work made for hire" for Company, including those portions of the Score which interpolate into it or contain incidental "strains" of the Composition. Company will have the exclusive right to own and administer the Work, including all copyrights, throughout the universe in perpetuity.  Company will have the perpetual and universal right (among all other rights of ownership) to use and perform the Work,

LNR/EL MARIACHI/LOS LOBOS MUSIC-          7
REVISED 8/29/95

EXHIBIT 1
21

or any portion thereof, in synchronization with the Picture for exploitation in any and all media now known or hereafter devised solely in connection with the Picture and the Album and/or Single (including, but not limited to, audiovisual devices), and in all forms of advertisements, trailers, featurettes, promotions or co-promotions now known or hereafter devised with respect thereto (collectively, "Promotions"). The decision as to whether the Work, or any portion thereof, will be used in the Picture will be made by Company in its sole discretion.

    B.   <u>Master</u>.  Company, in its sole discretion, will have the following rights, but not the obligations:

    (i)  Right to use and perform the Master for an unlimited number of times in the Picture for exploitation in any and all media now known or hereafter devised (including audiovisual devices) and in all Promotions for the Picture;

    (ii)  Right to exercise and exploit all of the rights pursuant to Paragraph 5.B(i) above in connection with any prequel, sequel, remake, television series or spinoff of the Picture (individually and collectively, "Sequel") for a reasonable fee to be determined in good faith solely by Company in accordance with then-current music industry customs and practices, provided that such Sequel is produced and/or distributed by a Sony Pictures Entertainment company;

    (iii)  Right to use and perform the Master in connection with items of merchandise related to the Picture (as opposed to merchandising the Master itself), including, but not limited to, toys, videogames, novels, books on tape, etc. (individually and collectively "Merchandise") and in Promotions therefor, for a reasonable fee to be negotiated in good faith between the parties in accordance with then-current music industry customs and practices, provided that Company shall have no right to use Artist's name or likeness in connection therewith without Artist's prior written approval, which may be withheld for any reason;

    (iv)  Right to include the Master on the Album and/or, subject to the Waiver, as a single record thereof even if for timing, editing or other reasons the Master is not ultimately embodied in the Picture, and in Promotions therefor;

    (v)  Right to use Artist's name, approved likenesses and approved biographical materials concerning Artist in connection with Promotions for the Picture, the Video (if any), the Album, the Sequel (if any, subject to the provisions of Paragraph 5.B(ii)) and the Merchandise (provided such use in connection with the Merchandise is limited to the use of the name as it appears in the billing block where the billing block is used in the Merchandise; otherwise, subject to the provisions of Paragraph 5.B(iv)); upon Company's written request, Artist or its

**EXHIBIT 1**

**22**

representative shall submit to Company a reasonable number of likenesses and a biography which shall be deemed approved by Artist for all uses in connection with this Agreement; Company shall be under no obligation to use such likenesses and/or biography, provided Company shall not use any other likeness and/or biography without Artist's prior written consent, which consent shall be deemed given if Artist or its representative does not disapprove of any likenesses and/or biography within forty-eight (48) hours of Company's written request for such consent; and

    (vi)  Right to refer (e.g., in publicity, news releases, electronic press kits, etc.) to the fact that the Picture or Album contains the Master or features the Master performed by Artist in connection with the Promotions.

C.  _Video_.  Company or the Distributor will have the right to produce and use the Video, if any, throughout the universe solely to advertise, publicize, promote and co-promote the Picture and the Album in any and all media now known or hereafter devised, including, without limitation, the right to use the Video for promotional purposes only on MTV, VH-1 and similar music programs and channels and other similar clip-type television shows or programs; in theatrical trailers; TV screens and monitors in theatre lobbies, shopping malls, record and video stores and other points of record or video purchases; on a free-loan basis in connection with a commercial video rental of the Picture; as a free promotional item to be given away to video retailers/distributors; on the head-end or back-end of home video devices; and in connection with electronic press kits.

D.  _Compositions_.

    (a) The Compositions shall each be deemed a "work-made-for-hire" for Company.  Accordingly, Company, in its sole discretion, shall have the following rights, but not the obligations, with respect to each Composition, without any additional payment therefor: the right to use and perform the Composition, or portions thereof, for an unlimited number of times and uses solely in the Picture for exploitation in any and all media now known or hereafter devised (including audio-visual devices) and in all forms of trailers, advertisements, featurettes, promotions and co-promotions now known or hereafter devised (individually and collectively, "Promotions") solely for the Picture; the right to exercise and exploit all of the aforesaid rights in connection with any prequel, sequel, remake, television series or spinoff of the Picture (subject to Paragraph 5.B(ii)); the right to use and perform the Compositions in connection with the Merchandise and in Promotions therefor; the right to include the Composition on the Album and exploit same in all configurations thereof, including as a single record, even if for timing, editing or other reasons the Composition is not

**EXHIBIT 1**

**23**

Promotions therefor; and the right to use Artist's name, approved likenesses and approved biographical materials concerning Artist (and Artist may submit approved likenesses and biographical materials for Company's use, and Company shall not use a non-approved item) in connection with Promotions for the Picture, the Video (if any), the Album (as set forth hereinabove), and the Merchandise (provided such use in connection with the Merchandise is limited to use of the name as it appears in the billing block where the billing block is used in the Merchandise; otherwise, subject to the provisions of Paragraph 5.B(iv)), which right shall include the right to refer to the fact that the Picture or Album contains the Composition or features the Composition performed by Artist in connection with the Promotions.

(b)   If required by the Distributor of the Album or Single, Artist or Bug Music shall grant a mechanical license for the use of the Compositions at the rate provided in Company's agreement with the Distributor but in no event less than three-fourths (3/4's) of then-current minimum statutory rate therefor in the United States.

(c)   Artist agrees that if Artist interpolates thematic material from the Compositions into the background musical score, this will in no way affect Company's ownership and control of one hundred percent (100%) of the Score.

(d)   Subject to sub-Paragraphs (a), (b) and (c) above, Company agrees to assign the ownership of one hundred percent (100%) of the copyright in the Compositions and one hundred percent (100%) of the "publisher's share" of income derived therefrom to Artist's music publishing designee, provided, that neither Artist nor Bug Music as Artist's publishing administrator shall, without Company's prior written approval, issue synchronization licenses with respect to the Compositions: (a) for a period of two (2) years from the release of the Picture in the United States; (b) for use as the title of, or the title song and/or theme song for any motion picture, television or other audio-visual program; and (c) in any advertisements or commercials relating to any product that competes with any product manufactured, distributed and/or sold by any entity related to, affiliated with or which owns or controls any interest in Company. Exhibit "C" attached hereto sets forth a list of products manufactured, distributed and/or sold by an entity related to affiliated with or which owns or controls an interest in Company. Exhibit "D" attached hereto sets forth Company's assignment of ownership to Artist's music publishing designee.

6.   FIRST OPPORTUNITY TO RE-EDIT OR RE-MIX.  Notwithstanding anything to the contrary contained in this Agreement, following Artist's delivery of the Master to Company, Company shall not make any material changes to the Master, other than timing, without Artist's approval, in which event Company shall afford Artist the

**EXHIBIT 1**

**24**

first opportunity (subject to Artist's reasonable availability) to re-edit or re-mix the Master.  If within three (3) days following Artist's receipt of such written request therefor, Artist is not available to re-edit or re-mix the Master, then Company or the Distributor, as applicable, shall have the right to engage a third party to re-edit or re-mix the Master.

If the foregoing accurately reflects your understanding of the agreement, please sign in the space provided below.  It is the intention of the parties to enter into more formal documentation containing other customary provisions for agreements of this nature; pending execution of such documentation, this deal memorandum will serve as the complete binding agreement between the parties.

Sincerely,

EL MARIACHI PRODUCTIONS, INC.

By _____

Its _____

AGREED AND ACCEPTED:

_____
STEVE BERLIN

_____
CONRAD LOZANO

_____
CESAR ROSAS

_____
LOUIS PEREZ

_____
DAVID HIDALGO

# CERTIFICATE OF AUTHORSHIP

For One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge, I hereby certify that I am writing or have written and original musical score ("Score") and those musical compositions, if any, listed on the attached Schedule "A" (collectively, "Compositions") intended for initial use in the motion picture tentatively entitled "El Mariachi II" ("Picture"), at the request of El Mariachi Productions, Inc. ("Company"), pursuant to an agreement between Company and me dated as of October 15, 1993 ("Agreement"). (The Score, the Compositions and all other results and proceeds of my services under the agreement are hereafter referred to as the "Work," subject to the terms and conditions of the Agreement.) I hereby acknowledge that the Work has been specially ordered or commissioned by Company for use as part of a contribution to a collective work or as part of the Picture or other audio-visual work, that the Work constitutes and shall constitute a work-made-for-hire as defined in the United States Copyright Act of 1976, as amended, that Company is and shall be the author of said work-made-for-hire and the owner of all rights in and to the Work, including, without limitation, the copyright therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof and that Company has and shall have the right to make such changes therein and such uses thereof as it may deem necessary or desirable.

I hereby assign the Work to Company and waive all rights of droit moral or "moral right of authors" or any similar rights or principals of law which I may now or later have in the Work. I warrant and represent that I have the right to execute this Certificate, that the Work is and shall be new and original with me and not an imitation or copy of any other material and that the Work is and shall be capable of copyright protection throughout the universe, does not and shall not and shall not violate or infringe upon any common law or statutory right of any party, including, without limitation, contractual rights, copyrights and rights of privacy, or constitute unfair competition, and is not and shall not be the subject of any litigation or of any claim that might give rise to litigation, including any claim by any copyright proprietor or any so-called "sampled" material contained in the Work. I shall indemnify and hold Company, the corporations comprising Company, and its and their employees, officers, agents, assignees and licensees, harmless from and against any losses, costs, liabilities, claims, damages or expenses (including, without limitation, court costs and attorneys' fees, whether or not in connection with litigation) arising out of any claim or action by a third party which is inconsistent with any warranty or representation made by me in this Certificate or in the Agreement

**EXHIBIT 1**

**26**

and which such claim is reduced to final adverse judgment. I agree to execute any documents and do any other acts which may be required by Company or its assignees or licensees to further evidence or effectuate Company's rights as set forth in this Certificate or in the Agreement. Upon my failure promptly to do so within ten (10) days from Company's request to do so, I hereby appoint Company as my attorney-in-fact for such purposes (it being acknowledged by me that such appointment is irrevocable and shall be deemed to be a power coupled with an interest (with full power of substitute and delegation.

I further acknowledge that in the event of any breach by Company of this Certificate or of the Agreement, I will be limited to my remedy at law for damages (if any) and will not have the right to terminate or rescind this Certificate or the Agreement or to enjoin the distribution, exploitation or advertising of the Picture or any materials in connection therewith. Nothing herein shall obligate Company to use my services or the Work in the Picture or to produce, distribute or advertise the Picture and that this Certificate shall be governed by the laws of the United States and the State of California applicable to agreements executed and to be performed entirely therein.

Company's rights may be freely assigned and licensed, and its rights shall be binding upon me and inure to the benefit of any such assignee or licensee. Company shall be free to assign its rights with respect to the Work, and to delegate its duties at any time and from time to time, in whole or in part, to any person or entity and Company shall thereafter be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement if such assignment is to: (i) a person or entity into which Company merges or is consolidated or (ii) a person or entity which acquires all or substantially all of Company's business and assets or (iii) a person or entity which is controlled by, under common control with, or controls Company or (iv) any major or "mini-major" motion picture company, United States television network or (v) other financially responsible party, who assumes in writing the performance and obligations of Company hereunder to be performed from and after such assignment.

IN WITNESS WHEREOF, I have signed this Certificate this _____ day of _____, 1994 effective as of October 15, 1993.


_____
STEVE BERLIN


_____
Social Security Number

LNR/EL MARIACHI/LOS LOBOS MUSIC-                13
REVISED 8/29/95

**EXHIBIT 1**

**27**

## CERTIFICATE OF AUTHORSHIP

For One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge, I hereby certify that I am writing or have written and original musical score ("Score") and those musical compositions, if any, listed on the attached Schedule "A" (collectively, "Compositions") intended for initial use in the motion picture tentatively entitled "El Mariachi II" ("Picture"), at the request of El Mariachi Productions, Inc. ("Company"), pursuant to an agreement between Company and me dated as of October 15, 1993 ("Agreement"). (The Score, the Compositions and all other results and proceeds of my services under the agreement are hereafter referred to as the "Work," subject to the terms and conditions of the Agreement.) I hereby acknowledge that the Work has been specially ordered or commissioned by Company for use as part of a contribution to a collective work or as part of the Picture or other audio-visual work, that the Work constitutes and shall constitute a work-made-for-hire as defined in the United States Copyright Act of 1976, as amended, that Company is and shall be the author of said work-made-for-hire and the owner of all rights in and to the Work, including, without limitation, the copyright therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof and that Company has and shall have the right to make such changes therein and such uses thereof as it may deem necessary or desirable.

I hereby assign the Work to Company and waive all rights of droit moral or "moral right of authors" or any similar rights or principals of law which I may now or later have in the Work. I warrant and represent that I have the right to execute this Certificate, that the Work is and shall be new and original with me and not an imitation or copy of any other material and that the Work is and shall be capable of copyright protection throughout the universe, does not and shall not and shall not violate or infringe upon any common law or statutory right of any party, including, without limitation, contractual rights, copyrights and rights of privacy, or constitute unfair competition, and is not and shall not be the subject of any litigation or of any claim that might give rise to litigation, including any claim by any copyright proprietor or any so-called "sampled" material contained in the Work. I shall indemnify and hold Company, the corporations comprising Company, and its and their employees, officers, agents, assignees and licensees, harmless from and against any losses, costs, liabilities, claims, damages or expenses (including, without limitation, court costs and attorneys' fees, whether or not in connection with litigation) arising out of any claim or action by a third party which is inconsistent with any warranty or representation made by me in this Certificate or in the Agreement

**EXHIBIT 1**
**28**

and which such claim is reduced to final adverse judgment. I agree to execute any documents and do any other acts which may be required by Company or its assignees or licensees to further evidence or effectuate Company's rights as set forth in this Certificate or in the Agreement. Upon my failure promptly to do so within ten (10) days from Company's request to do so, I hereby appoint Company as my attorney-in-fact for such purposes (it being acknowledged by me that such appointment is irrevocable and shall be deemed to be a power coupled with an interest (with full power of substitute and delegation.

I further acknowledge that in the event of any breach by Company of this Certificate or of the Agreement, I will be limited to my remedy at law for damages (if any) and will not have the right to terminate or rescind this Certificate or the Agreement or to enjoin the distribution, exploitation or advertising of the Picture or any materials in connection therewith. Nothing herein shall obligate Company to use my services or the Work in the Picture or to produce, distribute or advertise the Picture and that this Certificate shall be governed by the laws of the United States and the State of California applicable to agreements executed and to be performed entirely therein.

Company's rights may be freely assigned and licensed, and its rights shall be binding upon me and inure to the benefit of any such assignee or licensee. Company shall be free to assign its rights with respect to the Work, and to delegate its duties at any time and from time to time, in whole or in part, to any person or entity and Company shall thereafter be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement if such assignment is to: (i) a person or entity into which Company merges or is consolidated or (ii) a person or entity which acquires all or substantially all of Company's business and assets or (iii) a person or entity which is controlled by, under common control with, or controls Company or (iv) any major or "mini-major" motion picture company, United States television network or (v) other financially responsible party, who assumes in writing the performance and obligations of Company hereunder to be performed from and after such assignment.

IN WITNESS WHEREOF, I have signed this Certificate this _____ day of _____, 1994 effective as of October 15, 1993.

_____
CONRAD LOZANO

_____
Social Security Number

**EXHIBIT 1**

**29**

## CERTIFICATE OF AUTHORSHIP

For One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge, I hereby certify that I am writing or have written and original musical score ("Score") and those musical compositions, if any, listed on the attached Schedule "A" (collectively, "Compositions") intended for initial use in the motion picture tentatively entitled "El Mariachi II" ("Picture"), at the request of El Mariachi Productions, Inc. ("Company"), pursuant to an agreement between Company and me dated as of October 15, 1993 ("Agreement"). (The Score, the Compositions and all other results and proceeds of my services under the agreement are hereafter referred to as the "Work," subject to the terms and conditions of the Agreement.) I hereby acknowledge that the Work has been specially ordered or commissioned by Company for use as part of a contribution to a collective work or as part of the Picture or other audio-visual work, that the Work constitutes and shall constitute a work-made-for-hire as defined in the United States Copyright Act of 1976, as amended, that Company is and shall be the author of said work-made-for-hire and the owner of all rights in and to the Work, including, without limitation, the copyright therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof and that Company has and shall have the right to make such changes therein and such uses thereof as it may deem necessary or desirable.

I hereby assign the Work to Company and waive all rights of droit moral or "moral right of authors" or any similar rights or principals of law which I may now or later have in the Work. I warrant and represent that I have the right to execute this Certificate, that the Work is and shall be new and original with me and not an imitation or copy of any other material and that the Work is and shall be capable of copyright protection throughout the universe, does not and shall not and shall not violate or infringe upon any common law or statutory right of any party, including, without limitation, contractual rights, copyrights and rights of privacy, or constitute unfair competition, and is not and shall not be the subject of any litigation or of any claim that might give rise to litigation, including any claim by any copyright proprietor or any so-called "sampled" material contained in the Work. I shall indemnify and hold Company, the corporations comprising Company, and its and their employees, officers, agents, assignees and licensees, harmless from and against any losses, costs, liabilities, claims, damages or expenses (including, without limitation, court costs and attorneys' fees, whether or not in connection with litigation) arising out of any claim or action by a third party which is inconsistent with any warranty or representation made by me in this Certificate or in the Agreement

**EXHIBIT 1**
**30**

and which such claim is reduced to final adverse judgment. I agree to execute any documents and do any other acts which may be required by Company or its assignees or licensees to further evidence or effectuate Company's rights as set forth in this Certificate or in the Agreement. Upon my failure promptly to do so within ten (10) days from Company's request to do so, I hereby appoint Company as my attorney-in-fact for such purposes (it being acknowledged by me that such appointment is irrevocable and shall be deemed to be a power coupled with an interest (with full power of substitute and delegation.

I further acknowledge that in the event of any breach by Company of this Certificate or of the Agreement, I will be limited to my remedy at law for damages (if any) and will not have the right to terminate or rescind this Certificate or the Agreement or to enjoin the distribution, exploitation or advertising of the Picture or any materials in connection therewith. Nothing herein shall obligate Company to use my services or the Work in the Picture or to produce, distribute or advertise the Picture and that this Certificate shall be governed by the laws of the United States and the State of California applicable to agreements executed and to be performed entirely therein.

Company's rights may be freely assigned and licensed, and its rights shall be binding upon me and inure to the benefit of any such assignee or licensee. Company shall be free to assign its rights with respect to the Work, and to delegate its duties at any time and from time to time, in whole or in part, to any person or entity and Company shall thereafter be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement if such assignment is to: (i) a person or entity into which Company merges or is consolidated or (ii) a person or entity which acquires all or substantially all of Company's business and assets or (iii) a person or entity which is controlled by, under common control with, or controls Company or (iv) any major or "mini-major" motion picture company, United States television network or (v) other financially responsible party, who assumes in writing the performance and obligations of Company hereunder to be performed from and after such assignment.

IN WITNESS WHEREOF, I have signed this Certificate this _____ day of _____, 1994 effective as of October 15, 1993.

_____
CESAR ROSAS

_____
Social Security Number

LNR/EL MARIACHI/LOS LOBOS MUSIC-
REVISED 8/29/95

17

**EXHIBIT 1**

**31**

## CERTIFICATE OF AUTHORSHIP

For One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge, I hereby certify that I am writing or have written and original musical score ("Score") and those musical compositions, if any, listed on the attached Schedule "A" (collectively, "Compositions") intended for initial use in the motion picture tentatively entitled "El Mariachi II" ("Picture"), at the request of El Mariachi Productions, Inc. ("Company"), pursuant to an agreement between Company and me dated as of October 15, 1993 ("Agreement"). (The Score, the Compositions and all other results and proceeds of my services under the agreement are hereafter referred to as the "Work," subject to the terms and conditions of the Agreement.) I hereby acknowledge that the Work has been specially ordered or commissioned by Company for use as part of a contribution to a collective work or as part of the Picture or other audio-visual work, that the Work constitutes and shall constitute a work-made-for-hire as defined in the United States Copyright Act of 1976, as amended, that Company is and shall be the author of said work-made-for-hire and the owner of all rights in and to the Work, including, without limitation, the copyright therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof and that Company has and shall have the right to make such changes therein and such uses thereof as it may deem necessary or desirable.

I hereby assign the Work to Company and waive all rights of droit moral or "moral right of authors" or any similar rights or principals of law which I may now or later have in the Work. I warrant and represent that I have the right to execute this Certificate, that the Work is and shall be new and original with me and not an imitation or copy of any other material and that the Work is and shall be capable of copyright protection throughout the universe, does not and shall not and shall not violate or infringe upon any common law or statutory right of any party, including, without limitation, contractual rights, copyrights and rights of privacy, or constitute unfair competition, and is not and shall not be the subject of any litigation or of any claim that might give rise to litigation, including any claim by any copyright proprietor or any so-called "sampled" material contained in the Work. I shall indemnify and hold Company, the corporations comprising Company, and its and their employees, officers, agents, assignees and licensees, harmless from and against any losses, costs, liabilities, claims, damages or expenses (including, without limitation, court costs and attorneys' fees, whether or not in connection with litigation) arising out of any claim or action by a third party which is inconsistent with any warranty or representation made by me in this Certificate or in the Agreement

**EXHIBIT 1**

**32**

and which such claim is reduced to final adverse judgment. I agree to execute any documents and do any other acts which may be required by Company or its assignees or licensees to further evidence or effectuate Company's rights as set forth in this Certificate or in the Agreement. Upon my failure promptly to do so within ten (10) days from Company's request to do so, I hereby appoint Company as my attorney-in-fact for such purposes (it being acknowledged by me that such appointment is irrevocable and shall be deemed to be a power coupled with an interest (with full power of substitute and delegation.

I further acknowledge that in the event of any breach by Company of this Certificate or of the Agreement, I will be limited to my remedy at law for damages (if any) and will not have the right to terminate or rescind this Certificate or the Agreement or to enjoin the distribution, exploitation or advertising of the Picture or any materials in connection therewith. Nothing herein shall obligate Company to use my services or the Work in the Picture or to produce, distribute or advertise the Picture and that this Certificate shall be governed by the laws of the United States and the State of California applicable to agreements executed and to be performed entirely therein.

Company's rights may be freely assigned and licensed, and its rights shall be binding upon me and inure to the benefit of any such assignee or licensee. Company shall be free to assign its rights with respect to the Work, and to delegate its duties at any time and from time to time, in whole or in part, to any person or entity and Company shall thereafter be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement if such assignment is to: (i) a person or entity into which Company merges or is consolidated or (ii) a person or entity which acquires all or substantially all of Company's business and assets or (iii) a person or entity which is controlled by, under common control with, or controls Company or (iv) any major or "mini-major" motion picture company, United States television network or (v) other financially responsible party, who assumes in writing the performance and obligations of Company hereunder to be performed from and after such assignment.

IN WITNESS WHEREOF, I have signed this Certificate this _____ day of _____, 1994 effective as of October 15, 1993.

_____
LOUIS PEREZ

_____
Social Security Number

**EXHIBIT 1**
**33**

## CERTIFICATE OF AUTHORSHIP

For One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge, I hereby certify that I am writing or have written and original musical score ("Score") and those musical compositions, if any, listed on the attached Schedule "A" (collectively, "Compositions") intended for initial use in the motion picture tentatively entitled "El Mariachi II" ("Picture"), at the request of El Mariachi Productions, Inc. ("Company"), pursuant to an agreement between Company and me dated as of October 15, 1993 ("Agreement"). (The Score, the Compositions and all other results and proceeds of my services under the agreement are hereafter referred to as the "Work," subject to the terms and conditions of the Agreement.)  I hereby acknowledge that the Work has been specially ordered or commissioned by Company for use as part of a contribution to a collective work or as part of the Picture or other audio-visual work, that the Work constitutes and shall constitute a work-made-for-hire as defined in the United States Copyright Act of 1976, as amended, that Company is and shall be the author of said work-made-for-hire and the owner of all rights in and to the Work, including, without limitation, the copyright therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof and that Company has and shall have the right to make such changes therein and such uses thereof as it may deem necessary or desirable.

I hereby assign the Work to Company and waive all rights of droit moral or "moral right of authors" or any similar rights or principals of law which I may now or later have in the Work.  I warrant and represent that I have the right to execute this Certificate, that the Work is and shall be new and original with me and not an imitation or copy of any other material and that the Work is and shall be capable of copyright protection throughout the universe, does not and shall not and shall not violate or infringe upon any common law or statutory right of any party, including, without limitation, contractual rights, copyrights and rights of privacy, or constitute unfair competition, and is not and shall not be the subject of any litigation or of any claim that might give rise to litigation, including any claim by any copyright proprietor or any so-called "sampled" material contained in the Work.  I shall indemnify and hold Company, the corporations comprising Company, and its and their employees, officers, agents, assignees and licensees, harmless from and against any losses, costs, liabilities, claims, damages or expenses (including, without limitation, court costs and attorneys' fees, whether or not in connection with litigation) arising out of any claim or action by a third party which is inconsistent with any warranty or representation made by me in this Certificate or in the Agreement

**EXHIBIT 1**

**34**

and which such claim is reduced to final adverse judgment.  I agree to execute any documents and do any other acts which may be required by Company or its assignees or licensees to further evidence or effectuate Company's rights as set forth in this Certificate or in the Agreement.  Upon my failure promptly to do so within ten (10) days from Company's request to do so, I hereby appoint Company as my attorney-in-fact for such purposes (it being acknowledged by me that such appointment is irrevocable and shall be deemed to be a power coupled with an interest (with full power of substitute and delegation.

I further acknowledge that in the event of any breach by Company of this Certificate or of the Agreement, I will be limited to my remedy at law for damages (if any) and will not have the right to terminate or rescind this Certificate or the Agreement or to enjoin the distribution, exploitation or advertising of the Picture or any materials in connection therewith.  Nothing herein shall obligate Company to use my services or the Work in the Picture or to produce, distribute or advertise the Picture and that this Certificate shall be governed by the laws of the United States and the State of California applicable to agreements executed and to be performed entirely therein.

Company's rights  may be freely assigned and licensed, and its rights shall be binding upon me and inure to the benefit of any such assignee or licensee.  Company shall be free to assign its rights with respect to the Work, and to delegate its duties at any time and from time to time, in whole or in part, to any person or entity and Company shall thereafter be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement if such assignment is to: (i) a person or entity into which Company merges or is consolidated or (ii) a person or entity which acquires all or substantially all of Company's business and assets or (iii) a person or entity which is controlled by, under common control with, or controls Company or (iv) any major or "mini-major" motion picture company, United States television network or (v) other financially responsible party, who assumes in writing the performance and obligations of Company hereunder to be performed from and after such assignment.

IN WITNESS WHEREOF, I have signed this Certificate this _____ day of _____, 1994 effective as of October 15, 1993.

DAVID HIDALGO

Social Security Number

**EXHIBIT 1**

**35**

EXHIBIT "A-2"

RECORD COMPANY ACKNOWLEDGMENT

SUBSTITUTE LONDON RECORDS LETTER

EXHIBIT "A-3"

MUSIC PUBLISHING COMPANY ACKNOWLEDGMENT


Bug Music has read and is familiar with the Agreement
("Agreement") dated as of October 15, 1993 by and between El
Mariachi Productions, Inc. and Los Lobos (individually and
collectively, "Artist") in connection with the musical
compositions written by Artist for the motion picture tentatively
entitled "Return of the Mariachi," and agrees to waive its
exclusive rights to the songwriting services of the Artist with
respect to the use of said musical compositions as specifically
authorized in the Agreement, and otherwise agrees to the terms and
conditions of the Agreement only to the extent such terms and
conditions pertain to Bug Music.


BUG MUSIC


By_____

Its_____

EXHIBIT 1
37

EXHIBIT "B"

## PAID ADVERTISING EXCLUSIONS AND EXCEPTIONS

Company's Paid Ad credit obligations shall not apply to the following: group, list, institutional or so-called teaser advertising, publicity and exploitation; announcement advertising; advertising relating primarily to the source material upon which the Picture is based, or to the author, any member of the cast, the producer(s), writer(s) or any other personnel involved with the production of the Picture; so-called "award" or "congratulatory" advertisements, including advertisements or announcements relating to consideration or nomination for an award; trailers (including promotional films) or other advertising; publicity or exploitation on screen, radio or television; advertising in narrative form; advertising for film festivals, film markets and the like; advertising one-half page (or the equivalent in SAU's) in size or less; outdoor advertising (including, but not limited to so-called 24-sheets); theater display advertising; advertising relating to subsidiary or ancillary rights in the Picture (including, but not limited to novelizations, screenplay and other publications, products or merchandising, soundtrack recordings, videocassettes, videodiscs and other home video devices and the covers, packages, containers or jackets therefor); advertising in which no credit is accorded other than credit to one (1) or two (2) stars of the Picture and/or Company and/or to any other company financing or distributing the Picture; advertising, publicity and exploitation relating to by-products or commercial tie-ups; and other advertising not relating primarily to the Picture.

**EXHIBIT 1**
**38**

EXHIBIT "C"

SONY PRODUCTS

COLOR TVs

HIGH FIDELITY AUDIO SYSTEMS - Components, Rack Systems &
                                Shelf Systems

VHS VCRs & AV LASERDISC PLAYERS

8MM VIDEO PRODUCTS

MY FIRST SONY PRODUCTS

TELEPHONE PRODUCTS - Cordless Phones, Answering Machines &
                      Cellular Phones

RADIOS

PYXIS PERSONAL NAVIGATION SYSTEMS

MINIDISC

MULTIMEDIA CD-ROM PLAYER

DIGITAL AUDIO TAPE

PERSONAL AND PORTABLE STEREOS

AUTOSOUND - Car Stereo

**EXHIBIT 1**

**39**

**EXHIBIT B**

**EXHIBIT 1**
**40**

# Copyright

---

**Registration Number / Date:**
SR0000251474 / 1997-07-14

**Previous Registration:**
Sounds preexisting.

**Type of Work:**
Sound Recording

**Title:**
Desperado :the soundtrack.

**Date of Creation:**
1995

**Date of Publication:**
1995-08-09

**Copyright Claimant:**
℗ Sony Music Entertainment, Inc. (employer for hire)

**Performer:**
Collection performed by various artists.

**Basis of Claim:**
New Matter: compilation of recordings.

**Description:**
Compact disc.

**Imprint:**
c1995.

**Publisher Label Number:**
Epic Soundtrax EK 67294

**Names:**
Sony Music Entertainment, Inc.

**USCO Catalog Link:**
https://publicrecords.copyright.gov/detailed-record/voyager_12977911

---

Disclaimer: This material was generated by the U.S. Copyright Office's
Copyright Public Records System (CPRS). For certified records, contact

**EXHIBIT 1**
**41**

the <u>Records Research and Certification Division</u>. For information on searching copyright records, see <u>How to Investigate the Copyright Status of a Work (Circular 22)</u>. For information on removing personal information from Copyright Office public records, refer to <u>Privacy: Public Copyright Registration Records(Circular 18)</u>.

**EXHIBIT 1**
**42**